ANN ADAMS AND HUSBAND, DEXTER ADAMS, PLAINTIFFS v. ERIN CHRISTINA
TESSENER, DEFENDANT v. EDWARD SCOTT LACKEY, INTERVENOR

No. COA99-1353

(Filed 19 December 2000)

**1. Child Support, Custody, and Visitation— custody—natural parent unfit—review**

A trial court's legal conclusion that a parent is unfit is reviewed de novo on appeal by examining the totality of the circumstances, and, even though error is not specifically assigned to any of the trial court's findings of fact, all of the evidence adduced at the hearing is reviewed. Furthermore, in determining whether the evidence supports the findings, the appellate court examines whether the findings failed to treat any important issues raised by the evidence as well as whether the findings are supported by competent evidence.

**2. Child Support, Custody, and Visitation— custody—natural parent and third party—test**

In a custody dispute between two natural parents, or between two parties who are not natural parents, custody is to be given to the person or entity that will best promote the interest and welfare of the child, but between a natural parent and a third party, the natural parent has a constitutionally protected paramount interest and will be awarded custody unless it can be shown that the natural parent has either engaged in conduct inconsistent with the presumption that he or she will act in the best interest of the child, or has failed to shoulder the responsibilities attendant to raising a child. The court then turns to the "best interest" test only where such conduct by the natural parent is shown.

**3. Child Support, Custody, and Visitation— custody—awarded to grandparents rather than father**

The trial court erred in a custody contest between the maternal grandparents, the natural mother, and the natural father by concluding that the father was unfit to have custody of the child. The father had not had custody of the child before the hearing, so that there could be no allegation that he had failed to shoulder the responsibilities attendant to raising a child. As to whether he engaged in conduct inconsistent with the presumption that he will act in the best interest of the child, he is not required to show

ADAMS v. TESSENER

[141 N.C. App. 64 (2000)]

that he is without shortcomings, or that he has never made mistakes. Considering the totality of the circumstances, the findings did not support the conclusion that the natural father was unfit to have custody, and did not address a substantial body of evidence that he was fit to have custody.

Appeal by intervenor from judgment and order entered 3 June 1999 by Judge L. Suzanne Owsley in Burke County District Court. Heard in the Court of Appeals 18 September 2000.

*LeCroy, Ayers & Willcox, by M. Alan LeCroy, for plaintiffs-appellees.*

*Wayne O. Clontz, for defendant-appellee.*

*Crowe & Davis, P.A., by H. Kent Crowe; and J. Steven Brackett, for intervenor-appellant.*

FULLER, Judge.

The case at bar involves a custody dispute between the natural mother, the natural father, and the maternal grandparents of a minor child. Custody was awarded to the grandparents and the father appeals from that order. We begin with a summary of the pertinent facts and procedural history.

Evidence presented at the 2 February 1999 hearing tended to show the following. The father of the child, Edward Scott Lackey, is thirty-one years old, and lives in a three bedroom house in Hickory, North Carolina which he owns. He has been separated from his second wife for two years, and has been dating his current girlfriend, Sherry Letterman, for approximately one year. He has worked at Holland Alignment Service for thirteen years, and currently works 40 hours a week as an assistant manager earning $28,640 a year. Lackey's employer testified that Lackey is dependable, responsible, and a very hard worker. Lackey also works as a volunteer firefighter, which entails two to three hours of training each week. The chief of the fire department testified that he has known Lackey for 12 to 15 years and that Lackey is honest and is one of the more dependable firefighters in the department.

Letterman, who is thirty-four years old, and her two children, ages seven and eight, often stay overnight at Lackey's house, and Lackey regularly feeds the children, bathes them, helps them with homework, and puts them to bed. Letterman testified that Lackey is

wonderful with her children, that he loves them, that they think the world of him, and that they would give anything for him to be their father. Lackey has also been involved in helping to raise his sister's three sons, feeding them and changing their diapers during visits. In addition, Lackey helped raise his second wife's daughter during the year they were married and living together.

Lackey has been convicted of speeding (1986), operating an unregistered vehicle with no insurance (1986), reckless driving (1996), driving while licensed revoked (two convictions in 1997), appearing intoxicated and disruptive in public (1997), and reckless driving and resisting an officer (1997). Lackey's brother, Bobby Lackey (Bobby), has a significant criminal history. Bobby visits Lackey approximately once a month and stays overnight at Lackey's house from time to time, the longest visits lasting two or three nights.

The mother of the child, Erin Christina Tessener, met Lackey at a bar in July 1997. The two went home together that night and engaged in unprotected sexual intercourse while intoxicated. Approximately two months later, Tessener learned that she was pregnant. Tessener had ended a six-month relationship with another man shortly before meeting Lackey in July 1997. As a result, she did not know which one of the two men was the father of her unborn child. Tessener located Lackey in September 1997 and informed him of her pregnancy. She told him she believed she was already at least 12 weeks pregnant at that time, and for this reason Lackey believed it was unlikely that he was the father of the child, since their encounter had occurred approximately two months earlier. Tessener admitted to Lackey that it was possible that another man might be the father.

The child in question was born prematurely on 15 February 1998. After giving birth, Tessener came to live with her parents, Ann and Dexter Adams, while the child remained in the hospital due to health problems. When the child was released from the hospital he came to live with the Adamses as well. Tessener decided to leave the Adamses' residence and, on 7 April 1998, entered into a Consent Custody Agreement transferring permanent custody of the child to the Adamses. In this agreement, Tessener consented to the trial court's findings that she is incapable of providing proper care and support for the child as a result of certain diagnosed mental limitations, and that it was in the best interests of the child for him to be placed in the custody of the Adamses.

ADAMS v. TESSENER

[141 N.C. App. 64 (2000)]

In June 1998, Tessener located Lackey again and told him that the Adamses were going to attempt to collect child support from him. Lackey continued to believe he was not the father based on the time frame Tessener had earlier provided. Lackey was subsequently contacted by the Burke County Department of Social Services (DSS) and was informed that Tessener claimed that he was the father of the child. Lackey voluntarily requested a DNA test, and the results, which he received on 27 September 1998, indicated a 99.98 percent chance that he was the father of the child.

Letterman testified that Lackey was "almost in tears he was so happy" when he discovered he was the father of the child. She also testified that he immediately went out and started preparing for having a child, including purchasing a crib, diapers, a diaper pail, and clothes for the child. Lackey's mother similarly testified that Lackey was overjoyed when he discovered he was a father. Both Letterman and Lackey's mother testified that Lackey has wanted a child for a long time, and that Lackey's second wife was unable to become pregnant.

Lackey voluntarily signed a support agreement, and pursuant to that agreement he has paid $88.39 each week to date. Lackey contacted the Adamses by phone in late October 1998 and expressed his desire to spend time with his son. As of the 2 February 1999 hearing, Lackey had visited with the child approximately seven times. Each visit occurred in the Adamses' home except for one visit during which Lackey took the child to his own home from 9:00 a.m. until 4:30 p.m. During this visit, Lackey changed the child's diapers, and Lackey's girlfriend, mother, and sister took pictures of him with the child. The Adamses testified that during the visits at their home Lackey appeared to be a very affectionate father.

On 30 October 1998, Tessener filed a motion for modification of the custody order, seeking increased visitation rights and joint custody of the child. On 23 November 1998, Lackey filed a motion to intervene, seeking custody of the child. While these motions were pending, the trial court entered a temporary custody order on 4 January 1999 allowing Tessener and Lackey to visit the child at the Adamses' home on successive Sundays, and both parents fully exercised these visitation rights.

On 3 June 1999, the trial court entered an order placing the child in the permanent custody of the Adamses, and granting limited visitation privileges to Tessener and Lackey. In its order, the trial court

set forth sixty-eight factual findings. The trial court concluded as a matter of law that Lackey's conduct has proven him to be unfit to have custody of the child, and that the best interests of the child would be served by placing him in the custody of the Adamses. From this order Lackey appeals. Tessener has not appealed.

[1] On appeal, Lackey assigns error to the trial court's second conclusion of law, which states:

> The actions and conduct of the Intervenor have been inconsistent with his protected interest in the minor child. Specifically, the conduct of Intervenor as found above proves that he is unfit to have the primary and legal care, custody and control of the minor child. Therefore . . . the court must look to the best interests of the child.

In short, Lackey contends the trial court committed reversible error in concluding that he is unfit to have custody of the child. We agree.

In a custody proceeding, a trial court's legal conclusion that a parent is unfit is reviewed de novo on appeal by examining the totality of the circumstances. *Raynor v. Odom,* 124 N.C. App. 724, 731, 478 S.E.2d 655, 659 (1996). Therefore, although Lackey has not specifically assigned error to any of the trial court's findings of fact, we review all of the evidence adduced at the hearing, as well as the trial court's factual and legal findings, in order to determine "whether the evidence adduced supports the findings of fact by the trial court and whether those findings form a valid base for the conclusion of law." *Green v. Green,* 54 N.C. App. 571, 573, 284 S.E.2d 171, 173 (1981). Furthermore, in determining whether the evidence adduced supports the factual findings, we examine not only whether the factual findings are supported by competent evidence, but also whether the factual findings fail to treat any important issues raised by the evidence. *Dixon v. Dixon,* 67 N.C. App. 73, 77, 312 S.E.2d 669, 672 (1984).

[2] In a custody dispute between two natural parents, or between two parties who are not natural parents, custody is to be given to "such person, agency, organization or institution as will best promote the interest and welfare of the child." N.C.G.S. § 50-13.2(a) (1999). However, in a custody dispute between a natural parent and a third party who is not a natural parent, the natural parent has a "constitu-

tionally protected paramount interest in the companionship, custody, care, and control of his or her child." *Price v. Howard*, 346 N.C. 68, 79, 484 S.E.2d 528, 534 (1997). Pursuant to this protected interest, the natural parent will be awarded custody unless it can be shown that the natural parent has either engaged in conduct that is inconsistent with the presumption that he or she will act in the best interest of the child, or has failed to shoulder the responsibilities that are attendant to rearing a child. *Id.* Where such conduct on the part of the natural parent is shown, the trial court only then turns to the "best interest of the child" test to determine to whom custody should be awarded. *Id.* Conduct by the natural parent warranting application of the "best interest of the child" test includes neglect, unfitness, and abandonment. *Id.* "Other types of conduct, which must be viewed on a case-by-case basis, can also rise to this level so as to be inconsistent with the protected status of natural parents." *Id.* at 79, 484 S.E.2d at 534-35.

[3] Thus, our analysis in the case *sub judice* begins with Lackey's constitutionally protected paramount interest in the companionship, custody, care, and control of the child, and the presumption that Lackey is entitled to custody of the child. Since Lackey has not had custody of the child to date, there can be no allegation that he has failed to shoulder the responsibilities that are attendant to rearing a child. Thus, Lackey's paramount interest in custody of the child can only be overcome by a showing that he has engaged in prior conduct that is inconsistent with the presumption that he will, in the future, act in the best interest of the child. *Id.* at 79, 484 S.E.2d at 534 (A "natural parent's constitutionally protected paramount interest in the companionship, custody, care, and control of his or her child . . . is based on a presumption that he or she will act in the best interest of the child," and this interest may be overcome only "if his or her conduct is inconsistent with this presumption, or if he or she fails to shoulder the responsibilities that are attendant to rearing a child."). On this record such a showing has not been made.

The trial court's legal conclusion appears to have been influenced by three categories of evidence. The first category is Lackey's brother Bobby's history of criminal activity, including a conviction for taking indecent liberties with a minor child. However, there is no evidence that Bobby's untoward tendencies are likely to have any adverse impact on the welfare of the child if custody is awarded to Lackey. Bobby does not live with Lackey, nor does he keep any belongings at Lackey's home. Bobby testified that he has not gone out with Lackey

socially for two years. Although Bobby has visited Lackey approximately once a month in the past, Lackey testified that if he were awarded custody of the child he would be willing to prohibit Bobby from staying at his house and interacting with the child. The trial court has authority to include provisions in its custody order instructing Lackey to prohibit Bobby from interacting with the child, and we presume that Lackey would comply with such instructions absent evidence to the contrary. The trial court may also order periodic review of the case to ensure that such instructions are being followed. In sum, the factual findings pertaining to Lackey's brother Bobby's criminal history do not support the legal conclusion that Lackey himself is unfit to have custody of the child.

Second, the trial court's findings evince concern about Lackey's failure to become involved in Tessener's pregnancy and childbirth. We are not persuaded that under the present circumstances these factual findings should have been considered by the trial court in reaching its legal conclusion. Lackey testified that up until he received the DNA test results in September 1997, he believed he could not possibly be the father of the child because of the time frame of the pregnancy provided by Tessener. In fact, the evidence tended to show that Tessener and the Adamses believed it was more likely that Tessener's ex-boyfriend, whom Tessener had dated for six months, was the father. This view is buttressed by the fact that Tessener first sought to have her ex-boyfriend tested, and Lackey was not tested until after it was determined that Tessener's ex-boyfriend was not the father. In sum, the evidence tended to show that up until Lackey received the DNA test results, it was reasonable for him to believe he was not the father of Tessener's child, and to act in accordance with that belief. Thus, we are not persuaded that these findings are supported by the evidence, nor are we persuaded that they support a determination of parental unfitness.

Third, the trial court properly considered the fact that Lackey has been involved in six separate incidents of misconduct that have resulted in convictions. This is an appropriate area of inquiry in determining an individual's fitness as a parent. *See Raynor*, 124 N.C. App. at 731, 478 S.E.2d at 659 (holding that it was not error to consider plaintiff's DWI convictions in determining plaintiff's fitness as a parent). However, we believe that under the present circumstances, these factual findings are insufficient to support the trial court's legal conclusion that Lackey is unfit to have custody of the child.

Two of the incidents occurred thirteen years before the 2 February 1999 hearing, when Lackey was approximately eighteen years old, and are far too remote to bear on Lackey's current fitness as a parent. The remaining convictions occurred within a one-and-a-half-year period which, according to the testimony of Lackey's mother, coincided with the end of Lackey's relationship with his second wife. The most recent incident occurred in October 1997, approximately one year before Lackey learned he is a father, and there was no evidence adduced at the hearing that Lackey has engaged in any similar conduct since that time.

Lackey's testimony acknowledged the responsibility that comes with being a parent, and he pledged not to engage in similar conduct in the future. Lackey's mother testified that she has seen a change in her son's behavior for the better since his criminal convictions in 1997. Furthermore, none of the incidents involved actual or threatened physical violence, illegal substances, or weapons. In sum, we do not believe the factual findings pertaining to these incidents overcome the constitutional presumption that Lackey, as the natural parent, will act in the best interest of the child.

Moreover, the factual findings fail adequately to address a substantial body of evidence adduced at the hearing indicating that Lackey is fit to have custody of the child. The evidence tended to show that Lackey already has considerable experience in taking care of children. He has helped to raise Letterman's children, his sister's children, and his second wife's child. Letterman testified that Lackey is wonderful with her children and that her children think the world of him. Furthermore, although only four months elapsed between the time Lackey received the DNA test results and the date of the hearing, Lackey's conduct toward the child indicates a likelihood that he will be a responsible and loving father to the child. Lackey voluntarily agreed to pay child support, and has paid each month without fail. Lackey actively sought to spend time with the child, and visited with him on seven separate occasions in four months, each visit lasting anywhere from four to seven and a half hours. The Adamses testified that Lackey was loving and affectionate with the child during these visits. Lackey testified that if he is awarded custody, either his mother, who lives across the street from him, or a nearby day care program would provide care for the child during the day while Lackey is at work. We also take note of the fact that Lackey has now been actively engaged in these legal proceedings for approximately two years, evidencing a long-term commitment to attaining custody of the

child. In sum, all of the evidence adduced at the hearing indicated that Lackey is likely to be a caring, compassionate, and responsible father.

In addition, the totality of the evidence tended to show that Lackey is responsible and reliable in both the professional and financial areas of his life. Lackey has been employed by the same company for 13 years, and has held the position of assistant manager for seven years. His employer, who has known Lackey for 12 to 15 years, described him as dependable, reliable, and a hard worker. Lackey owns his home and there is no indication that he is in financial difficulty. Lackey volunteers as a firefighter and the chief of the fire department described Lackey as hard-working and trustworthy. The fact that Lackey volunteers as a firefighter in his spare time without compensation indicates that he is an active and responsible member of his community.

Lackey is not required to show that he is without shortcomings, or that he has never made mistakes in the past. Lackey is the natural father of the child, and as against third parties who are not natural parents of the child, Lackey enjoys a constitutionally protected paramount interest in custody of the child. Thus, Lackey must be awarded custody unless it is shown that Lackey has engaged in conduct that is inconsistent with the presumption that he will act in the best interest of the child. After careful consideration of the totality of the circumstances, we do not believe such a showing has been made in this case. We believe the factual findings do not support the legal conclusion that Lackey is unfit to have custody of the child. Furthermore, we believe the factual findings fail adequately to address a substantial body of evidence adduced at trial indicating that Lackey is indeed fit to have custody of the child. We reverse the order of the trial court, and remand with instructions to award custody of the child to Lackey, and to set such provisions as may be deemed appropriate.

Reversed and remanded.

Chief Judge EAGLES and Judge TIMMONS-GOODSON concur.